**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 21, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHAEL A. TERWILLIGER,

      Plaintiff - Appellant,

v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

      Defendant - Appellee.

No. 19-1028
(D.C. No. 1:17-CV-02878-RM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **O'BRIEN**, and **MATHESON**, Circuit Judges.
_____

Michael A. Terwilliger appeals the district court's order affirming the

Commissioner's denial of Social Security benefits. We affirm.

I

Terwilliger applied for disability and supplemental security income benefits,

claiming he was disabled by back and spine problems. An administrative law judge

___

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

(ALJ) denied his applications, but the Appeals Council remanded the case for additional consideration because Terwilliger had undergone back surgery days before the ALJ issued his decision. On remand, Terwilliger amended his alleged onset date to January 11, 2014, but after another hearing, a different ALJ concluded at step five of the five-step disability evaluation process, *see Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (explaining the process), that he was not disabled. The ALJ determined Terwilliger was severely impaired by degenerative disc disease, major depressive disorder, and somatic symptom disorder, but he did not satisfy the criteria for a listed impairment and he retained the residual functional capacity (RFC) to perform light work subject to certain restrictions.[1] Specifically, the ALJ determined Terwilliger could only occasionally perform postural activities, though he could not crawl, climb ladders, ropes, or scaffolds, and he could not be exposed to hazards such as unprotected heights or moving mechanical parts. The ALJ also determined he could not tolerate "concentrate[d] exposure to extreme heat, extreme cold, vibration, very loud noise, fumes, odors, dusts, gases, and poor ventilation." R. at 154. Additionally, the ALJ limited him to frequent use of both upper extremities, frequent

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b), 416.967(b).

2

foot controls of both feet, and simple, routine, and repetitive tasks that entailed only occasional interaction with supervisors, coworkers, and the public. Given this RFC, the ALJ concluded Terwilliger could not perform his past relevant work but, based on testimony from a vocational expert (VE), he could transition to other jobs, including an assembler of small products, a mail clerk, and an office helper. The Appeals Council denied review, and the district court affirmed.

Terwilliger now contends the ALJ incorrectly evaluated the medical source evidence, erred in finding he did not meet the criteria for a listed impairment, improperly assessed his RFC, and posed inaccurate hypothetical questions to the VE.

## II

"We review the Commissioner's decision to determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (internal quotation marks omitted). "In conducting our review, we may neither reweigh the evidence nor substitute our judgment for that of the Commissioner." *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). Although Terwilliger was represented by counsel in the district court, he is pro se on appeal. Accordingly, we afford his pro se materials a liberal construction, but we do not act as his advocate and do not make arguments on his behalf. *See Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1173 (10th Cir. 2013). "We will consider and discuss only those of [his] contentions that have been adequately briefed for our review." *Keyes-Zachary*, 695 F.3d at 1161.

3

*A. Medical Source Evidence*

Terwilliger first contends the ALJ incorrectly evaluated the medical source evidence. An ALJ must consider all the medical opinions in the record and discuss the weight he assigns to them. *See id.* An ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). "[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).

First, the ALJ must determine whether the opinion "is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). "Such an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* If the opinion is not well-supported, it is not entitled to controlling weight and "the inquiry at this stage is complete." *Watkins*, 350 F.3d at 1300. But if the opinion is well-supported, the ALJ "must then confirm that the opinion is consistent with other substantial evidence in the record." *Id.* "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* Indeed, "it is an error to give an opinion controlling weight simply because it is the opinion of a treating source[.]" *Id.* (brackets and internal quotation marks omitted).

4

Second, "[e]ven if a treating physician's opinion is not entitled to controlling weight, treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § 404.1527 [and § 416.927]." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (brackets and internal quotation marks omitted). The factors to be considered are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (internal quotation marks omitted).

Terwilliger broadly contends the ALJ failed to comply with these rules. He says his doctors determined he was disabled by various symptoms and conditions, including pain, poor concentration, anxiety, depression, an inability to sit or stand for more than 15 minutes, panic attacks, insomnia, side-effects of medication, postural limitations, and his inability to drive. He asserts the ALJ ignored this evidence, discussed only evidence that supported the denial of benefits, and credited the opinion of a non-treating consultative examiner over the opinions of his doctors.

These arguments, however, are based on the faulty premise that the ALJ was required to accept the doctors' opinions on the issue of disability. A treating physician's opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the

5

[Commissioner]." *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994); *see also* 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1). Thus, the ALJ was not required to defer to any doctor's opinion that Terwilliger was disabled.

Further, to the extent Terwilliger contends the ALJ erred in weighing the evidence, including that from his providers, we have no authority to reweigh it. *See Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013). The record confirms he has significant back problems: he has undergone at least six surgeries beginning in the 1990s for spinal fusions, removal of surgical hardware, and implantation of a spinal cord stimulator to help alleviate his chronic pain. The record also confirms he has been prescribed narcotic pain medications to treat his chronic pain. Nonetheless, our task is not to reweigh the evidence, but to ensure the ALJ properly evaluated it.

On that score, Terwilliger cites seven different providers who he says offered opinions that were entitled to controlling weight. In the district court, however, he challenged the ALJ's evaluation of six providers' opinions. *See* R. at 1187-1200. We limit the scope of our review accordingly. *See Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) ("The scope of our review . . . is limited to the issues the claimant properly preserves in the district court . . . .").

*1. Dr. Zehr*

First, Terwilliger contends the ALJ rejected a physical activity form completed by Dr. Robyn Zehr, his primary care physician. On the form, which was dated February 13, 2014, Dr. Zehr indicated Terwilliger had been visiting her monthly

6

since December 2013. She diagnosed chronic pain syndrome, back and neck pain, paresthesia, and depression, stating his prognosis was fair. She answered questions posed on the form, indicating he could sit and stand for 10 minutes (but his ability to stand on concrete was worse), stand or walk less than 2 hours, and sit for about 2 hours in an 8-hour work day. She noted he needed to shift at-will from sitting, standing, or walking. She also circled "Yes" to a question asking whether he would "sometimes need to take unscheduled breaks," indicating he would need a 5-to-60-minute break, including lying down, every 10 minutes. R. at 486-87. She stated his legs should be elevated to waist-level for prolonged sitting and, if he were assigned sedentary work, his legs should be elevated 40% of an 8-hour day. She further indicated he could spend 10% of an 8-hour work day bending at the waist and 0% twisting, although elsewhere on the form, she stated he could never bend, twist, crouch, or climb ladders and could only occasionally climb stairs. Dr. Zehr stated Terwilliger could occasionally lift less than 10 pounds, but never more than 10 pounds, and he must use a cane. She also indicated he had significant limitations with repetitive reaching, handling, or fingering but elsewhere indicated he could handle and finger 90% of an 8-hour work day and reach 75% of an 8-hour work day. *Id.* at 487. Apart from these limitations, Dr. Zehr indicated he should avoid extreme cold but need not avoid extreme heat, humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents and cleaners, or chemicals. Finally, Dr. Zehr noted at the bottom of the form: "I am not a trained functional capacity provider. Form filled out based on patient history & examination." *Id.* at 488.

7

The ALJ gave Dr. Zehr's opinion "less weight" because "she did not identify any clinical findings, physical examination results, or imaging studies to explain the work limitations that she assessed." *Id.* at 159. This was an appropriate basis for declining to give her opinion controlling weight. A medical opinion must be well-supported by medically acceptable clinical or laboratory diagnostic techniques: an opinion is not entitled to controlling weight if it imposes restrictions without support or explanation. *See Langley*, 373 F.3d at 1120 (affirming denial of controlling weight where ALJ recognized treating physician's opinion failed to reference any diagnostic tests, and neither the physician's treatment notes nor his medical source statement indicated he performed any diagnostic tests); *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002) (affirming ALJ's denial of controlling weight and discounting of opinion where ALJ recognized treating physician failed to explain the differences between his original and new restrictions); Social Security Ruling (SSR) 96-2P, 1996 WL 374188, at *2 (July 2, 1996) (stating a treating source medical opinion cannot be given controlling weight if it is not "well-supported" because "[t]he adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion"); *cf. Krauser*, 638 F.3d at 1331 (reversing denial of controlling weight because, although the ALJ concluded the treating physician failed to reference objective tests, that conclusion was "flatly incorrect," as the treating physician cited x-rays and blood work and noted that earlier records were unavailable). Here, Dr. Zehr cited no medically acceptable clinical and laboratory diagnostic techniques, nor did she provide any

8

explanation for the limitations she assessed, some of which were internally inconsistent. Though she vaguely referenced Terwilliger's "patient history & examination," R. at 488, the ALJ recognized this comment failed to identify any particular medical record or explain how she arrived at her conclusions. And although Dr. Zehr ordered MRIs, she did not rely on them in formulating her opinion because they were not completed until February 28, 2014, after she completed the form.

Nonetheless, the ALJ still was obligated to weigh the opinion under the regulatory factors at the second part of the treating-physician inquiry. On this score, the ALJ considered the length, frequency, nature, and extent of the treatment relationship, as well as the degree of explanation and support for Dr. Zehr's opinion. The ALJ noted she completed the form shortly after Terwilliger's amended onset date, January 11, 2014, and she apparently stopped treating him in February 2014. The form, which is dated February 13, 2014, confirms Dr. Zehr had been seeing Terwilliger on a monthly basis since December 2013. Thus, she had been treating him for only two months when she completed the form. *See Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (recognizing the treating physician relationship requires "both duration and frequency").[2] Moreover, her treatment coincides with the

_____

[2] The ALJ did not question Dr. Zehr's status as a treating physician. Nonetheless, both this court and the Supreme Court have recognized that "'the assumption that the opinions of a treating physician warrant greater credit tha[n] the opinions of other experts may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration.'" *Doyal*, 331 F.3d at 762 (brackets omitted) (quoting *Black & Decker Disability Plan v. Nord*,

period of alleged disability for even less time—only from January 11, 2014, through the conclusion of Dr. Zehr's treatment in February 2014—which, as the ALJ recognized, predates most of the alleged disability period, including when Terwilliger underwent 5 of his 6 spine surgeries. Under these circumstances, the ALJ properly considered Dr. Zehr's opinion and appropriately gave it less weight.

### 2. *Dr. Pouliot*

Second, Terwilliger contends the ALJ rejected the opinion of Dr. Matthew Pouliot. Dr. Pouliot twice examined Terwilliger, once as a new patient on February 4, 2014—before he performed an April 7, 2014 nerve root block on Terwilliger and before Terwilliger underwent a spinal fusion on April 21, 2014, with Dr. Edward Donner—and again in June 2014 as a follow-up. Dr. Pouliot diagnosed "[f]ailed back syndrome and increasing lumbar and radicular leg pain on the left side" and "[f]unctional impairment." *Id.* at 481-82. The ALJ failed to discuss these diagnoses.

The ALJ erred by failing to discuss this evidence. *See Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014). Yet Terwilliger fails to show how this error was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Indeed, "the need for express analysis is weakened when the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC." *Mays*, 739 F.3d at 578 (brackets and internal quotation marks

538 U.S. 822, 832 (2003) (discussing treating physician rule in the context of the Employee Retirement Income Security Act)).

omitted). "[A]n ALJ's failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]." *Id.* at 578-79. The rationale is that "the claimant is not prejudiced because giving greater weight to the opinion would not have helped [him]." *Id.* at 579 (internal quotation marks omitted).

Terwilliger identifies no inconsistency between the RFC for a limited range of light work and Dr. Pouliot's diagnoses, nor does he explain how the diagnoses translate to any specific functional limitations that are inconsistent with the RFC. Indeed, without any specific functional limitations, there is no obvious impact on the RFC, as the diagnoses alone do not automatically establish he was disabled, *see Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). In short, Terwilliger's arguments fail to show prejudice, and we will not conjure arguments on his behalf, *see Mays*, 739 F.3d at 576.

### 3. Dr. Donner

Third, Terwilliger contends the ALJ erred in rejecting opinions of his surgeon, Dr. Edward Donner. Dr. Donner performed a spinal fusion and other procedures on April 21, 2014. Four days later, on April 25, he completed a state division of motor vehicles application form so Terwilliger could get a disability parking pass. On the form, he checked a box indicting Terwilliger was among those "[p]ersons who are severely limited in their ability to walk due to an arthritic, neurological, or orthopedic condition." R. at 913. Then, on November 5, 2014, Dr. Donner performed additional surgery to remove surgical hardware and repeat a nerve root decompression. Later,

11

on July 2, 2015, Dr. Donner completed a "Colorado Employment First Participation Medical Verification Form" for Terwilliger.[3]  *Id.* at 1065.  On the form, Dr. Donner checked a box stating, "I find this individual has been or will be unable to work at any job due to a physical or mental impairment for the period of 1 year or more."  *Id.*

The ALJ discussed the Employment First and parking pass forms but discounted the opinions expressed on them.  To the extent the Employment First form opined on the ultimate issue of disability, the ALJ correctly declined to give the opinion controlling weight.  *See* 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1).  Otherwise, the ALJ properly declined to give the opinions controlling weight because Dr. Donner failed to provide any clinical findings or explanation for his conclusions.  *See Langley*, 373 F.3d at 1120; *White*, 287 F.3d at 907-08.  Indeed, the Employment First form contains no functional findings or explanation, and although the parking pass application indicates Terwilliger's ability to walk was severely impaired, it provides no support or explanation for that finding—it contains only a single checked box making the assertion.  *Cf. Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) (discussing a Med-9 form and affirming that "[t]he ALJ properly gave no weight to this conclusory form, which lacked any functional findings").  Nonetheless, the ALJ weighed the opinions, recognizing Dr. Donner was Terwilliger's surgeon, but also observing he did "not provide useful guidance regarding [Terwilliger's] vocationally

---

[3] Colorado Employment First is part of the federal Temporary Assistance for Needy Families (TANF) program.  To qualify for monetary assistance under TANF, an individual must participate in an employment program unless a physician certifies that the individual is physically or mentally unfit for employment.

relevant restrictions" and he "did not describe any specific limitations regarding [Terwilliger's] ability to lift, carry, sit, stand, walk, or perform other work-related physical activities." R. at 157. The ALJ clearly considered the nature of Dr. Donner's treatment relationship, as well as the lack of evidence and explanation he provided for his opinions. *See* 20 C.F.R. §§ 404.1527(c)(2),(3); 416.927(c)(2),(3). Under these circumstances, where Dr. Donner merely checked boxes on the forms, the ALJ adequately explained why he gave the opinions little weight.

### 4. Dr. Beasley

Fourth, Terwilliger says the ALJ ignored the opinion of Dr. Kara Beasley, his surgeon who implanted a spinal cord stimulator. Terwilliger points out that the ALJ failed to specifically discuss her August 11, 2015, operative diagnoses of "[c]hronic pain syndrome," "[f]ailed back syndrome," and obesity. R. at 1082. Although the ALJ did not discuss these specific diagnoses, he discussed the operative notes, demonstrating he clearly considered them. *See Mays*, 739 F.3d at 576 ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." (internal quotation marks omitted)).

### 5. Dr. Neville

Fifth, Terwilliger contends the ALJ rejected two opinions from Dr. Thomas Neville, who began treating Terwilliger in November 2015. First, in January 2016, Dr. Neville completed a Med 9 work-status form,[4] diagnosing Terwilliger with

---

[4] A Med 9 work-status form is used to ensure that an individual receiving TANF benefits is physically or mentally unfit for employment.

degenerative disc disease of the lumbar spine.  On the form, Dr. Neville summarized Terwilliger's surgical history and indicated he could not work because he had low back pain, he was "very limited in [his] ability to stay on his feet or sit upright due to low back pain," and he experienced "some sedation with pain med[ication]."  R. at 1067.

The ALJ properly declined to give this opinion controlling weight because the issue of whether a claimant is disabled is reserved to the Commissioner. *See Castellano*, 26 F.3d at 1029.  To the extent Dr. Neville expressed any functional limitations, the ALJ appropriately discounted the opinion because Dr. Neville provided no clinical support or other medical explanation for his conclusions. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (explaining that the more support and explanation provided for an opinion, the more weight the agency will give it).

Dr. Neville's second opinion was expressed on a physical capacity assessment form he completed on February 25, 2016.  On the form, which largely consisted of checked boxes and circled answers, Dr. Neville described Terwilliger's primary medical problem as:  "low back pain related to past back surgery & left leg & foot pain radicular."  R. at 1125.  When asked to provide objective medical support for this finding, Dr. Neville wrote:  "6 cm surgical scar vertically in lower lumbar area – tender to touch reduced flexion in back to 60° and apparent pain."  *Id.*  Dr. Neville indicated Terwilliger could lift 10 pounds at most, he could stand or walk only 15 minutes before needing to sit or lie down, and he could sit a maximum of 15-20 minutes before needing to move.  He also indicated Terwilliger should avoid lifting,

14

climbing, balancing, stooping, crouching, kneeling, and crawling. Additionally, Dr. Neville circled answers indicating Terwilliger needed to lie down for 15 minutes every 2 hours throughout the day, he would miss 4 or more days of work per month, and he would lose 1 hour of productivity every 8-hour work day due to his condition. Last, Dr. Neville stated Terwilliger could occasionally reach, handle, and finger; he should avoid heights, moving machinery, temperature extremes, humidity, and vibration; but he need not avoid dust, noise, or fumes.

The ALJ declined to give the opinion controlling weight because it was not well-supported and because it was inconsistent with the report of Dr. Kerry Kamer, a consultative examiner. Both were appropriate grounds for declining controlling weight. Initially, the ALJ observed that Dr. Neville failed to support his opinions with any clinical medical evidence. Although he noted Terwilliger's surgical scar, sensitivity to touch, and reduced range of motion, these findings offer no objective insight into Terwilliger's condition or limitations, apart from perhaps the recognition that he had previously undergone surgery. This alone was an adequate basis for declining to give the opinion controlling weight.

The ALJ also noted that Dr. Neville's assessment was inconsistent with the physical assessment performed by the consultative examiner, Dr. Kamer. Dr. Kamer examined Terwilliger on December 5, 2015 and concluded that in an 8-hour work day, he could continuously lift and carry up to 10 pounds, frequently lift and carry up

15

to 20 pounds, occasionally lift and carry up to 50 pounds,[5] and never lift or carry up to 100 pounds. Dr. Kamer found he could sit up to 4 hours at a time for a total of 8 hours and stand or walk for 1 hour at a time for a total of six hours. Dr. Kamer determined Terwilliger needed to use a cane to ambulate,[6] but he could continuously reach, handle, finger, feel, push, or pull with both hands and frequently use foot controls. Dr. Kamer further determined Terwilliger could occasionally climb, stoop, kneel, crouch, and crawl, and frequently balance. Finally, he found Terwilliger could continuously tolerate exposure to moving parts and dust; frequently tolerate exposure to unprotected heights, operating a motor vehicle, and extreme heat; and occasionally tolerate humidity, extreme cold, and vibrations. The ALJ determined these findings were supported by the evidence and entitled to significant weight.

Terwilliger insists the ALJ was obliged to credit his treating doctor's opinion over the consultative examiner's opinion, but the ALJ explained why he declined to do so. The ALJ noted that accompanying Dr. Kamer's physical assessment was a comprehensive, 7-page report detailing in narrative form the explanation for Dr. Kamer's findings. Dr. Kamer recounted the history of Terwilliger's condition, including his diagnoses and symptoms, the different modes of treatment he pursued,

---

[5] The ALJ incorrectly indicated that Dr. Kamer limited Terwilliger to occasionally lifting 40 pounds. It is unclear whether this was merely a typo, but even if it was not, the ALJ's reference to a 40 pound restriction is more restrictive than the limitations actually assessed by Dr. Kamer and less restrictive than the ALJ's RFC for light work, which restricted Terwilliger to lifting only 20 pounds.

[6] The ALJ incorrectly indicated Dr. Kamer assessed no assistive devices, though Terwilliger does not explain why this is reversible error.

16

and the time and nature of his surgeries. Unlike Dr. Neville, Dr. Kamer chronicled

Terwilliger's medications and diagnostic studies, including operative reports, CT

scans, x-rays, and MRIs. This detailed analysis of the medical record justifies the

ALJ's decision to afford significant weight to Dr. Kamer's opinion. As the ALJ

explained, Dr. Kamer's opinion was based on a thorough physical exam and a

substantial amount of medical records, including operative reports and imaging

studies. The ALJ further explained that Dr. Kamer's opinion was more thorough and

detailed than Dr. Neville's assessment. In light of this explanation, the ALJ

appropriately declined to give Dr. Neville's opinion controlling weight.

*See* SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996). ("In appropriate

circumstances, opinions from State agency medical and psychological consultants . . .

may be entitled to greater weight than the opinions of treating or examining

sources.").[7]

The ALJ was still required to weigh Dr. Neville's opinion. On this score, the

---

[7] Terwilliger does not challenge the incongruence between some aspects of the ALJ's RFC and the limitations assessed by either Dr. Kamer or Dr. Neville. Nonetheless, we note that "exact correspondence between a medical opinion and the . . . RFC is not required." *Wells v. Colvin*, 727 F.3d 1061, 1071 (10th Cir. 2013). Indeed, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. The ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (brackets and internal quotation marks omitted); *see also* SSR 96-5P, 1996 WL 374183, at *5 (July 2, 1996) ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, *a medical source statement must not be equated with the administrative finding known as the RFC assessment.* Adjudicators must weigh medical source statements . . ., providing appropriate explanations for accepting or rejecting such opinions." (emphasis added)).

17

ALJ recognized Dr. Neville had only been treating Terwilliger for a relatively short period of time, since November 2015, some three months. The ALJ also found a lack of evidentiary support for Dr. Neville's restrictions. For example, Dr. Neville stated Terwilliger need to lie down for 15 minutes every 2 hours, but Terwilliger did not report he needed to lie down. Rather, an office note states Terwilliger once complained that he slept poorly and "falls asleep during the day." R. at 1015. Another office note indicates Dr. Neville instructed him to engage in "[p]hysical activity (like walking vigorously) for 30 minutes 5 times a week. . . ." *Id.* at 1014. The ALJ also observed Dr. Neville's treatment notes documented a reduced range of motion and difficulty getting out of a chair due to stiffness, but they did not indicate any clinical findings that supported the significant degree of limitations he assessed, nor was there any indication that he reviewed Terwilliger's x-rays or MRIs. These are specific, legitimate reasons for discounting Dr. Neville's opinion and lending more weight to Dr. Kamer's opinion. *See White*, 287 F.3d at 907 (affirming ALJ's decision to discount treating physician's opinion in favor of more detailed evaluation performed by consultative examiner). While we may have reached a different conclusion had we been the fact finder, that is not our function, and we may not reweigh the evidence. *See id.* at 908.

### 6. *PA Kottenstette*

Last, Terwilliger says the ALJ improperly rejected the opinion of Chris Kottenstette, a physician's assistant (PA) at Dr. Neville's office. An office note dated February 25, 2016, references "paper work" and indicates Terwilliger was "in

18

for filling out [a] form for his attorn[e]y about his back problems – he is going to be before a judge in a disability hearing[.]" R. at 1113. The next day, PA Kottenstette signed a physical assessment form that largely mirrors Dr. Neville's assessment. An office note from PA Kottenstette dated the same day, February 26, states that Terwilliger's "physical functioning paperwork was completed by his physical therapist. I reviewed this and then signed the form for his lawyer." *Id.* at 1133.

The ALJ properly discounted PA Kottenstette's assessment. Initially, the ALJ recognized PA Kottenstette is not a licensed physician and therefore he is not an "acceptable medical source." SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). Consequently, he could not offer a medical opinion or establish the existence of a medically determinable impairment. *See id.* (stating that "only 'acceptable medical sources' can give . . . medical opinions" and "[i]nformation from . . . 'other sources' cannot establish the existence of a medically determinable impairment").

Although the ALJ was still required to consider the assessment, he did so and cited multiple reasons for discounting it. He noted the assessment failed to provide any medical evidence or explanation for the assessed limitations. The form cites an unspecified MRI, physical exam, and x-rays, but there is no explanation how this evidence supports the limitations assessed on the form. Indeed, there is no explanation why this or any other evidence meant Terwilliger should avoid lifting as much as possible and could lift no more than 15 pounds, nor is there any explanation why he could stand or sit for only 15 minutes before needing to change positions. Neither is there any explanation why PA Kottenstette believed he needed to lie down

19

for 15 minutes every 2 hours. As the ALJ observed, there is nothing in PA Kottenstette's notes indicating that he needed to lie down or that Terwilliger even reported needing to lie down. Perhaps the physical therapist simply copied this finding from Dr. Neville's unsupported assessment, but absent any explanation from PA Kottenstette, it is impossible to know. The form references Terwilliger's "significant pain," R. at 1128, but again, PA Kottenstette did not explain or otherwise tie this comment to any of the restrictions he assessed. Moreover, the ALJ recognized the limitations were inconsistent with PA Kottenstette's own treatment notes, which indicate Terwilliger was in mild or no acute distress, he had decreased sensation in his lower left leg, but otherwise he retained good use, strength, and function in his lower extremities. And finally, the ALJ discounted the assessment because PA Kottenstette merely signed-off on the findings made by a physical therapist. Like a physician's assistant, a physical therapist is not an "acceptable medical source" and cannot offer a medical opinion or establish the existence of a medically determinable impairment. *See* SSR 06-03p, 2006 WL 2329939, at \*1-2. For all these reasons, we think the ALJ adequately explained his decision.

### B. *Listed Impairments*

Turning to Terwilliger's next issue, he contends the ALJ erred at step 3 of the disability-evaluation process by finding he did not meet a listed impairment. The Supreme Court has made clear that "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Here, the ALJ considered several listings,

20

including 1.04A (disorders of the spine), 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04, which sets forth the following criteria:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

*Id.*

The ALJ concluded Terwilliger did not satisfy all of these criteria because, although he had a spinal disorder with a limited range of motion in his lumbar spine, he had full strength, no muscle weakness or atrophy, and negative straight-leg raising tests. On this latter point, the ALJ was wrong because a straight-leg test administered by Dr. Pouliot was positive on the left, although the treatment note does not indicate whether the test was seated or supine. R. at 923. Nonetheless, the error was harmless because Terwilliger cites no evidence that he satisfied all the remaining criteria for Listing 1.04A, and we may not search the record on his behalf, *see Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

### C. RFC

Terwilliger next contends the ALJ incorrectly assessed his RFC. The ALJ determined he had the RFC for a restricted range of light work, that is, work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of

objects weighing up to 10 pounds, 20 C.F.R. §§ 404.1567(b); 416.967(b).

Additionally, the ALJ imposed certain postural limitations, finding Terwilliger could not climb or crawl but he could occasionally stoop, kneel, crouch, and balance. The ALJ also imposed environmental restrictions, excluding jobs that exposed Terwilliger to unprotected heights and moving mechanical parts, extreme heat and cold, vibration, loud noises, fumes, odors, dusts, gases, and poor ventilation. Last, the ALJ found he could frequently use both upper extremities and both feet, though he was limited to simple, routine, and repetitive tasks that entailed only occasional interaction with supervisors, coworkers, and the public.

Terwilliger does not challenge these findings. Instead, he broadly protests that his "RFC was not assessed properly, as [his] ability is non[-]existent." Aplt. Br. at 3.[8] But this argument relies on the faulty premise that the ALJ was required to defer to his doctors' opinions on the issue of disability, which we have already rejected. We have also already explained that the ALJ properly gave more weight to Dr. Kamer's assessments than to the opinions of his other providers. That the ALJ gave substantial weight to Dr. Kamer's opinion but moderated it in Terwilliger's favor, accounting for the diminished weight of his doctors' opinions, does not suggest any error.[9] "[T]here is no requirement in the regulations for a direct

---

[8] Because Terwilliger's opening brief contains multiple pages with the same page numbers, we cite the pages of his brief in numerical sequence.

[9] Portions of Dr. Kamer's opinion are incongruent with the RFC. Specifically, Dr. Kamer determined Terwilliger could occasionally lift and carry up to 50 pounds and frequently lift up to 20 pounds, but the ALJ limited him to lifting only 20 pounds

22

correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo*, 682 F.3d at 1288. It is the ALJ's job to determine the claimant's RFC based on the evidence in the record. *See id.*

Terwilliger insists the RFC does not account for his failed back surgery, his pain, or the side-effects of his pain medication. But Terwilliger cites no evidence indicating—or even a standard by which to determine—that his back surgeries failed. In fact, the ALJ cited evidence that after his back surgeries, a trial implantation of the spinal cord stimulator resulted in a 20% to 35% reduction of his pain, and a subsequent surgery for implantation of a spinal cord stimulator paddle lead resulted in 55% pain relief. Notwithstanding these reductions in his pain symptoms, the ALJ formulated an RFC that accounted for his chronic pain by limiting him to lifting and carrying 20 pounds occasionally and 10 pounds frequently, *see* R. at 156, which is more restrictive than Dr. Kamer's assessment. The ALJ also recognized he continued to suffer side-effects from his pain medication, including drowsiness and impaired coherence. Yet the ALJ cited substantial evidence indicating he was alert and cooperative, he exhibited normal mood and affect, he had a normal attention span and

---

maximum and 10 pounds frequently; Dr. Kamer also found he could occasionally climb and crawl, but the ALJ determined he could not climb or crawl; and Dr. Kamer imposed no environmental restrictions, while the ALJ restricted his environmental exposure. Terwilliger advances no argument regarding these discrepancies between the RFC and Dr. Kamer's opinion, all of which *benefit* Terwilliger. "[W]e are aware of no controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably" to the claimant. *Chapo*, 682 F.3d at 1288. Indeed, "if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit." *Id.*

23

concentration, and his memory, judgment, and insight were intact. *See id.* at 161; *see also, e.g.*, *id.* at 1014, 1038. The ALJ properly assessed Terwilliger's RFC.

### D. Step Five Hypothetical Questions

Finally, Terwilliger contends the ALJ erred at step five by posing hypothetical questions that did not include all of his limitations, in particular his inability to sit or stand for longer than 10 minutes and the side-effects of his medications. It is well-established that the ALJ's hypothetical questions must include all, but only, those limitations borne out by the evidentiary record. *Newbold*, 718 F.3d at 1268. We have explained that the ALJ properly evaluated evidence suggesting he could sit and stand no more than 10 minutes and experienced side-effects from medication. Thus, the ALJ correctly excluded from his hypothetical questions any additional limitations on these grounds.

Terwilliger also asserts that when his attorney presented all of his limitations to the VE, she ruled out the possibility of transitioning to other jobs. The transcript from the administrative hearing refutes this assertion, however. The ALJ's first question specified limitations that mirrored the RFC. Based on those limitations, the ALJ asked whether a hypothetical person could perform Terwilliger's past relevant work. The VE replied that he could not, but he could perform other jobs existing in significant numbers in the national economy, including working as an assembler of small products, a mailroom clerk, and an office helper. R. at 60-61. This testimony was dispositive of the ALJ's conclusion that Terwilliger could perform other jobs. Yet the ALJ posed additional questions, asking the VE to assume the same

limitations as the first question but also impose a requirement that the hypothetical claimant be allowed a sit/stand option. The VE replied that the same three jobs would remain available. *See id.* at 61. The rest of the ALJ's questions involved the availability of sedentary work, which has no impact on our analysis. The VE's testimony was substantial evidence upon which the ALJ properly based his step-five conclusion that Terwilliger was not disabled.

III

The district court's judgment is affirmed.

Entered for the Court

Terrence L. O'Brien<br>Circuit Judge